Gary A. Anderson, Bond Counsel
City of Olathe, Kansas
Gilmore Bell PC
2405 Grand Boulevard, Suite 1100
Kansas City, Missouri 64108-2521
Dear Mr. Anderson:
You request our opinion regarding whether the Kansas Tax Increment Finance (TIF) Act[2] authorizes use of proceeds from bonds issued under that Act[3] to finance portions of certain redevelopment projects. Specifically, your questions are:
 "Question I Under the Act may the proceeds of TIF/STAR bonds be used to finance theme park amenities such as waiting-area shelters, sculptures and decorative gates, so long as such items are not personal property under Kansas law?"
 "Question II Can TIF/STAR Bond proceeds be used to finance the portions of an open-air sports stadium that will be below grade, which are not personal property? This would include such items as concrete retaining walls, concrete used for the base of the seating and similar costs?"
 "Question III Can TIF/STAR Bond proceeds be used to finance the portions of an open-air sports stadium, including a stage area, that will be used for purposes of keeping the sun and rain off the spectators?"
 "Question IV Because the Act specifically allows for the financing of `parking facilities' can TIF/STAR Bond proceeds be used to finance multi-story parking decks to be owned [by] or leased to a developer?"
 and
 "Question V Can TIF/STAR Bond proceeds be used to finance amusement park rides to be owned [by] or leased to a developer? This would include only those portions of the rides that are not personal property (e.g. metal tracks, concrete foundations)."
It is our understanding that while only Question IV specifically mentions the developer's interest in the property sought to be financed with TIF/STAR bond proceeds, the property involved in each of the proposals would be owned by or leased to the developer.
The Tax Increment Finance Act
We have set forth and discussed the purpose and general process of the TIF Act in recent opinions.[4] Generally speaking, the TIF Act is a vehicle for making certain eligible areas[5] more viable by applying certain revenues, which may include the tax differential between the old property values (set before any improvement to the area) and the new values (set after the redevelopment district is established), and, for some projects, certain local and state sales taxes,[6] toward paying for development of the area. In other words, the city uses bond proceeds to purchase real estate and build or improve infrastructure in an area, then, as property values increase and taxable sales are made within the district, the city (and, with regard to sales taxes, the State) forgoes its right to the increased tax revenues and applies them instead to the payment of bonds. A city is authorized "to issue special obligation bonds in one or more series to finance the undertaking of any redevelopment project. . . ."[7] Additionally, a city is authorized "to issue full faith and credit tax increment bonds to finance the undertaking of any redevelopment project . . ."[8] with certain exceptions.[9] The proceeds of these bonds may be used to pay redevelopment project costs, as defined in K.S.A. 2005 Supp. 12-1770a, to implement the redevelopment project plan.[10] Your questions center on what kinds of costs can be considered "redevelopment project costs" that may be paid for with these bond proceeds.
K.S.A. 2005 Supp. 12-1770a provides in part:
 "(q) `Redevelopment project costs' means those costs necessary to implement a redevelopment project plan or a bioscience development project plan, including costs incurred for:
 "(1) Acquisition of property within the redevelopment project area;
 "(2) payment of relocation assistance pursuant to a relocation assistance plan as provided in K.S.A. 12-1777, and amendments thereto;
 "(3) site preparation including utility relocations;
 "(4) sanitary and storm sewers and lift stations;
 "(5) drainage conduits, channels, levees and river walk canal facilities;
 "(6) street grading, paving, graveling, macadamizing, curbing, guttering and surfacing;
 "(7) street light fixtures, connection and facilities;
 "(8) underground gas, water, heating and electrical services and connections located within the public right-of-way;
 "(9) sidewalks and pedestrian underpasses or overpasses;
 "(10) drives and driveway approaches located within the public right-of-way;
 "(11) water mains and extensions;
 "(12) plazas and arcades;
 "(13) parking facilities;
 "(14) landscaping and plantings, fountains, shelters, benches, sculptures, lighting, decorations and similar amenities; and
 "(15) related expenses to redevelop and finance the redevelopment project, except that for a redevelopment project financed with special obligation bonds payable from the revenues described in subsections (a)(1)(D) and (a)(1)(G) of K.S.A. 12-1774, and amendments thereto, such expenses shall require prior approval by the secretary of commerce.
 "Redevelopment costs shall not include costs incurred in connection with the construction of buildings or other structures to be owned by or leased to a developer, however, the `redevelopment project costs' shall include costs incurred in connection with the construction of buildings or other structures to be owned or leased to a developer which includes an auto race track facility. In addition, for a redevelopment project financed with special obligation bonds payable from the revenues described in subsections (a)(1)(D) and (a)(1)(G) of K.S.A. 12-1774, and amendments thereto, redevelopment project costs shall not include:
 "(1) Fees and commissions paid to real estate agents, financial advisors or any other consultants who represent the businesses considering locating in a redevelopment district;
 "(2) salaries for local government employees;
 "(3) moving expenses for employees of the businesses locating within the redevelopment district;
 "(4) property taxes for businesses that locate in the redevelopment district;
 "(5) lobbying costs; and
 "(6) a bond origination fee charged by the city pursuant to K.S.A. 12-1742, and amendments thereto."[11]
In addition to the restrictions listed in the above-quoted definition of "redevelopment project costs," STAR bond proceeds may not be used to finance personal property.[12]
For each question you present, we must determine whether the proposed expenditure of TIF/STAR bond proceeds would fall within the statutory definition of "redevelopment project costs." Thus, for each question we must consider whether the property proposed to be financed with TIF/STAR bond proceeds (1) is necessary to implement a redevelopment project plan (or a bio-science development project plan), (2) is included in the list of allowable expenses expressed in K.S.A. 2005 Supp.12-1770a(q)(1)-(15), (3) is not a building or other structure to be owned by or leased to a developer, and (4) where STAR bonds are to be used, is not personal property. We address each of your questions in the order you submitted them.
 "Question I Under the Act may the proceeds of TIF/STAR bonds be used to finance theme park amenities such as waiting-area shelters, sculptures and decorative gates, so long as such items are not personal property under Kansas law?"
We do not question the contention that these theme park "amenities" are "necessary to implement [the] redevelopment project plan." That is primarily a question of fact and beyond the scope of this opinion. Additionally, we do not doubt that these are the type of public improvements specifically authorized in K.S.A. 2005 Supp.12-1770a(1)-(15) to be financed using proceeds from TIF/STAR bonds.[13] The issues needing resolution, therefore, are (1) whether such amenities are precluded from being financed using STAR bond proceeds by the provisions prohibiting such financing of personal property and (2) whether such amenities are precluded from being financed using TIF or STAR bonds by the provision prohibiting such financing of costs "incurred in connection with the construction of buildings or structures to be owned by or leased to the developer."
In your letter requesting our opinion, you begin your discussion of Question I by asserting your belief that the amenities at issue would be considered real property, or fixtures, rather than personal property. We agree.
The TIF Act directs us to look to K.S.A. 79-102 for the definition of "personal property," as that term is used in the Act. K.S.A. 79-102
provides in part:
 "The term `personal property' shall include every tangible thing which is the subject of ownership, not forming part or parcel of real property; also the capital stock, undivided profits and all other assets of every company, incorporated or unincorporated, and every share or interest in such stock, profit, or assets, by whatever name the same may be designated, provided the same is not included in other personal property subject to taxation or listed as the property of individuals; and also every share or interest in any vessel or boat used in navigating any of the waters within or bordering on this state, whether such vessel or boat shall be within the jurisdiction of the state or elsewhere; and also all `property' owned, leased, used, occupied or employed by any railway or telegraph company or corporation within this state, situate on the right-of-way of any railway.
 . . . .
 "The words `personal property,' when used in this act in their general sense, shall include all taxable property other than real property, as hereinbefore defined."
K.S.A. 79-102 defines "real property" as follows:
 "[T]he terms `real property,' `real estate,' and `land,' when used in this act, except as otherwise specifically provided, shall include not only the land itself, but all buildings, fixtures, improvements, mines, minerals, quarries, mineral springs and wells, rights and privileges appertaining thereto."
The shelters, sculptures and decorative gates you describe are more like the types of property considered real property under this definition, especially as it is contemplated that they will be affixed to the real estate with the intent of the owner that they become part of the realty.[14]
You next contend that these theme park "amenities" would not run afoul of the prohibition against using TIF/STAR bond proceeds to pay "costs incurred in connection with the construction of buildings or structures to be owned by or leased to a developer" because in your opinion the contemplated shelters, sculptures and fences do not constitute "buildings or structures" as that phrase is used in K.S.A. 2005 Supp.12-1770a(q). Your reasons for this conclusion are threefold: "(1) the `buildings and other structures' exception should be construed narrowly [to avoid swallowing the rule that real property may be acquired using STAR Bond proceeds and then transferred or leased to a developer[15]]; (2) the term `other structures' should be limited to those structures similar to `buildings'; and (3) the legislature's use of the different terms `shelters' `sculptures' and `decorations' [in K.S.A. 2005 Supp.12-1770a(q)(14)] and `structures' [in the provision excluding costs incurred in connection with the construction of buildings or other structures to be owned by or leased to a developer] suggests a different intended meaning."[16]
We agree that the definition of "redevelopment project costs" should be construed consistently with the intent of the Legislature as expressed through the statutory language, giving ordinary words their ordinary meanings and giving full effect to every part of the Act as written. However, we do not believe that either the plain language of the statute or legislative intent, as determined through a review of legislative history, requires or allows as narrow a reading of this limitation on use of TIF/STAR bond proceeds as you suggest.
 "The fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. However, where the intent is not clearly expressed, courts are not limited to consideration of the language employed but may properly look into the historical background of the enactment, the circumstances attending its passage, the purposes to be accomplished, and the effect the statute may have under various suggested constructions."[17]
Further, "legislative intention is to be determined from a general consideration of the entire act" and "[e]ffect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible."[18]
In our opinion, the way to do justice to the purpose of the Act, which is to promote economic development and stimulate private investment in a community by financing and effectuating acquisition of the property as well as financing certain public improvements surrounding development of the property,[19] as well as give effect to every part of K.S.A. 2005 Supp. 12-1770a(q) and the TIF Act as a whole, is to read it so that construction of buildings or other structures may be financed using TIF/STAR bond proceeds (assuming such costs are necessary to implement a redevelopment project plan or bio-science development project plan, are not personal property and meet all other requirements of the Act), but not if the buildings or other structures so financed are to be owned by or leased to the developer.[20] Such a reading does not require us to limit the phrase "costs incurred in connection with the construction of buildings or other structures," as used in K.S.A. 2005 Supp.12-1770a(q), to exclude the types of structures listed in K.S.A. 2005 Supp. 12-1770a(q)(1)-(15). Rather, those types of structures may indeed be constructed using TIF/STAR bond proceeds, as long as they are not then owned by or leased to the developer. To read this restriction on use of TIF/STAR bond proceeds as you have suggested, in our opinion, would require that we add the phrase "except for those buildings or other structures listed in paragraphs (1)-(15) of this subsection" to the beginning of the restriction, or the word "similar" between "buildings or other" and "structures." Additionally, the narrow reading you suggest would appear to disregard the language "in connection with the construction of," which indicates that authorizing the "acquisition" of property within the redevelopment district[21] (which may then be sold, transferred or leased to the developer)[22] and limiting "construction" of buildings and other structures to be owned by or leased to the developer are two different concepts; the latter is not necessarily an exception to the former.
Having established the applicable rules of construction and the context within which the language of the statute is to be construed, it remains for us to determine whether the shelters, sculptures and fences about which you inquire are "buildings or other structures" for purposes of the prohibition found in K.S.A. 2005 Supp. 12-1770a(q).
The phrase "buildings or other structures" is not specifically defined for purposes of the TIF Act, nor is it generally defined in K.S.A. 2005 Supp. 77-201. However, K.S.A. 2005 Supp. 77-201 Second does provide that "[w]ords and phrases shall be construed according to the context and the approved usage of the language" while "technical words and phrases, and other words and phrases that have acquired a peculiar and appropriate meaning in law, shall be construed according to their peculiar and appropriate meanings." We do not believe the phrase "buildings or other structures" is a technical one, or one that has acquired a peculiar meaning in law. Therefore, we must construe it according to the context and approved usage of the words, which is another way of saying we must look to the ordinary meaning of the words unless some different meaning is necessitated by the context of their usage.[23]
As you note, the term "building" is defined in Black's Law Dictionary[24] as "a structure with walls and a roof, esp. a permanent structure." Thus, in accordance with this definition, a building is a type of structure. The term "structure" is defined in Black's as follows:
 "Any construction, or any production or piece of work artificially built up or composed of parts joined together in some definite manner. That which is built or constructed; an edifice or building of any kind.
 "A combination of materials to form a construction for occupancy, use or ornamentation whether installed on, above, or below the surface of a parcel of land."[25]
You suggest that the term "buildings or other structures" was intended to include only those that are enclosed spaces capable of habitation or storage. However, we find nothing in either the Act or its history that supports this argument. While the term "structure" is not defined in the TIF Act, it is defined in other statutes to include objects that are not capable of habitation or storage, such as bridges, culverts and overhead transmission lines.[26] Neither does the use of the term in other sections of the TIF Act limit its meaning in this way.[27] You cite to cases that interpret the term "building or other structure" narrowly using the construction rule that where a general term in a statute follows a list of specific examples, the general term should refer to things of the same nature or classification.[28] However, the cases you cite both dealt with criminal statutes, which must be strictly construed against the State.[29] The same rule of strict construction does not apply to the TIF Act. Further, there is no list of specific examples in the prohibition at issue and the term structure is not limited in this statute to those similar to or like buildings.
Because the term structure can have either a very broad or more limited meaning, and because when used in its broadest sense the term can mean almost anything that is constructed or manufactured, we believe review of legislative history is appropriate to determine what the Legislature actually intended this provision to preclude.
As noted in Attorney General Opinion No. 2005-14, the initial version of the TIF Act authorized use of the proceeds from bonds issued under its provisions "to finance any necessary related streets and municipal utilities," but not for "the construction of buildings or other improvements to be owned by such developer."[30] This was the language proposed by the Special Committee on Local Government upon completion of its interim review of urban redevelopment of downtown areas.[31] One of the issues before the Committee "concerned the extent of the role of the city in the project," and specifically whether the city's bonding authority should be limited to financing the costs of the purchase of land and the clearing of that land or whether cities should have the authority "to issue bonds for the purchase and clearing of land and for the construction of the actual project on the land itself."[32] The Committee directed that two bill drafts be prepared, one with the more limited use of bonds for purchase and clearing of land only and the other with a more expanded authorized use of bonds "for the actual development of the project on the land itself" whereby the city "would remain the owner of the entire project and actually be the developer" and the city "would lease building spaces to private businesses."[33]
However, both these drafts were eventually rejected in favor of a third alternative that granted cities the power of eminent domain and the authority to issue bonds "to pay the cost of the acquisition and clearing of the redevelopment site and the cost of relocation assistance and to finance any necessary related street and municipal utilities costs."[34] None of the proceeds from the sale of such bonds was to be used "for the construction of buildings or other improvements to be owned by such developer."[35]
This proposal, 1976 House Bill No. 2666, was introduced in the House Committee on Federal and State Affairs in the 1976 Session of the Legislature.[36] One conferee testifying in support of the bill stated:
 "The bonds issued could only be used for specific purposes, that is; to acquire property, pay relocation expenses, prepare sites, and to finance any necessary related streets and municipal utilities. The bonds under this bill cannot be used to make improvements or construct buildings owned by the developer. The bonds can only be used for purposes which benefit the redevelopment area, and, by so doing, the entire city."[37]
On the Senate side, a motion was made and carried to also allow the bond proceeds to be used "to pay all necessary related expenses to redevelop and finance the specified downtown redevelopment project."[38] There is no recorded discussion relative to this amendment. The House concurred in this change.[39] This portion of the bill was not otherwise amended.
In 1979, the Act was amended in part to preclude leasing property acquired by a city pursuant to the Act to a developer.[40] No discussion of this amendment appears in the legislative history of the bill. However, a motion was made and seconded to require cities to recoup the cost of acquisition of land and improvements from the developer; this motion failed to carry.[41] In 1980, the authority to lease to developers property that had been acquired pursuant to the provisions of the Act was reinserted.[42]
In 1988, the TIF Act was amended in conjunction with and to compliment amendments made to the Municipal Improvement District Act (MID).[43]
Amendments to the MID Act included broadening the scope of authorized activities to include provision of "services," such as sanitation, security, transportation, and parking facilities, and "amenities" such as benches, shelters and sculptures.[44] At the same time, the TIF Act was amended so that the "necessary related streets and municipal utilities" language was deleted and replaced with the original version of the list of appropriate uses that is now found in K.S.A. 2005 Supp.12-1770a(q). The list of appropriate uses of bond proceeds in the TIF Act was modeled after the MID Act's definition of the term "improvement."[45] The language "[n]one of the proceeds from the sale of such bonds shall be used for the construction of buildings or otherimprovements to be owned by such developer" in the TIF Act was changed to "[n]one of the proceeds from the sale of such bonds shall be used for the construction of buildings or other structures to be owned by such developer."[46] While proponents of the 1988 TIF Act amendments stated that their purpose was to "simplify and enhance the flexibility of tax increment financing" and "[c]larify the uses for which funds may be expended to include site preparation, streets, drainage, parking, landscaping,"[47] there was no recorded discussion about whether these amendments were intended to allow funds to be expended for listed improvements/structures that were to be owned by or leased to the developer.[48] One conferee stated:
 "The proposed amendment would also broaden the definition that tax increment funds can be used for to include site preparation, streets, drainage, parking, landscaping, etc. It still would not include structures to be owned by the developer."[49]
Another conferee stated:
 "The project definition, for which project funds may be expended, is broadened (like MID) to include site preparation, streets, drainage, parking, landscaping, etc. (but not the structures to be owned by developer)."[50]
STAR bonds were first included as a method of financing certain redevelopment projects in 1993.[51]
The 1997 Legislature reinserted the caveat that bond proceeds could not be used for the construction of buildings or other structures to be owned by or leased to a developer, and included the exception from this prohibition for "proceeds of such bonds as may be issued under subsection (a)(1)(D) of K.S.A. 12-1774"[52] and redevelopment districts including land and buildings comprising a state mental health institution closed pursuant to law.[53] In 1998, the exception to the no-buildings-or-structures-to-be-owned-by-or-leased-to-developers rule was narrowed to include only the Kansas Speedway project and redevelopment districts including land and buildings comprising a state mental health institution closed pursuant to law.[54] The language delineating what proceeds of bonds issued under the Act could be used for was removed from K.S.A. 12-1773 in the 2001 restructuring of the Act and was used to define the term "redevelopment project costs" and placed in K.S.A. 12-1770a.[55] In 2004, K.S.A. 12-1774(a)(1)(D) was amended to prohibit use of STAR bond proceeds to finance personal property[56]
and, finally, in 2005 was amended to require prior approval by the Secretary of Commerce of any project to be financed with STAR bond proceeds and to prohibit use of STAR bond proceeds to pay for certain expenses of businesses locating within the redevelopment district as well as certain expenses of the city.[57]
A 1997 performance audit report analyzing the TIF Act characterized the purpose for issuance of TIF/STAR bonds as a tool to pay "the city's share" of redevelopment project costs, and described the type of allowable expenditures as including land acquisition, site preparation and relocation expenses. "A major benefit of tax increment financing to the developer is that capital expenditures — such as buying land, relocating utilities, and grading sites — are being paid for by the city."[58] A more recent audit report recognized that TIF/STAR bonds could, and were, also being used to pay many soft costs as well, and could be used to finance construction of buildings that would be owned by the city.[59] Still, Post Audit questioned whether these were the types of expenditures that the Legislature had really intended to allow.[60] Post Audit's recommendations in this latter report are what led to the 2005 amendments discussed above.
The original version of the TIF Act suggests use of bond proceeds was to be limited to acquisition of land, relocation assistance and funding of certain public improvements. The legislative history of the 1988 amendments to the TIF Act likewise suggests that the proceeds of bonds issued thereunder were to be used to finance (in addition to acquisition of property and the difference between the cost of that property and the sale price to the developer) only public improvements.[61] Subsequent to 1988, most amendments to the definition of "redevelopment project costs" have limited, rather than expanded, its scope.[62] With this history in mind, it appears to us that the limitation against using bond proceeds for "costs incurred in connection with the construction of buildings or other structures to be owned by or leased to a developer" should be read broadly to prohibit use of such proceeds for financing property commonly thought of as a structure. Unfortunately, we cannot determine, as a matter of law, that sculptures, fences and shelters are always or are never considered structures. It may be that some are, and some are not, depending on whether they are merely decorative and insubstantial or more permanent, substantial and part of the infrastructure. Because the issue cannot be decided as a matter of law, we leave this decision to the city in the first instance and the Secretary of Commerce in his review of the proposed redevelopment project.
 "Question II Can TIF/STAR Bond proceeds be used to finance the portions of an open-air sports stadium that will be below grade, which are not personal property? This would include such items as concrete retaining walls, concrete used for the base of the seating and similar costs?"
In our opinion, TIF/STAR bond proceeds may be used to finance construction of such property, as they would not be considered personal property and are the type of public infrastructure improvements authorized by K.S.A. 2005 Supp. 12-1770a(q)(1)-(15), but such proceeds may not be used if such facilities are to be owned by or leased to the developer. The portions of the stadium you describe are, in our opinion, clearly structures as commonly defined, albeit they are built below grade.
 "Question III Can TIF/STAR Bond proceeds be used to finance the portions of an open-air sports stadium, including a stage area, that will be used for purposes of keeping the sun and rain off the spectators?"
In our opinion, TIF/STAR bond proceeds may be used to finance construction of such shelters, as they would not be considered personal property and are the type of public infrastructure improvements authorized by K.S.A. 2005 Supp. 12-1770a(q)(1)-(15), but such proceeds may not be used if such facilities are to be owned by or leased to the developer. As described, the covered stage area contemplated in this question would be considered a structure that may not be owned by or leased to a developer if TIF/STAR bond proceeds are to be used to finance its construction.
 "Question IV Because the Act specifically allows for the financing of `parking facilities' can TIF/STAR Bond proceeds be used to finance multi-story parking decks to be owned [by] or leased to a developer?"
You correctly note that the definition of "redevelopment project costs" includes costs incurred for "parking facilities," which would appear to encompass a multi-story parking deck. However, the definition also excludes costs incurred in connection with the construction of buildings "or other structures," which would also appear to encompass a multi-story parking deck, to be owned by or leased to a developer other than a developer of an auto race track facility.
In our opinion, as noted above, costs incurred for parking facilities such as a multi-story parking deck are considered redevelopment project costs that may be paid for with the proceeds of TIF/STAR bonds, but not if those parking facilities are to be owned by or leased to the developer. Because a multi-story parking deck is clearly a structure, the proceeds from bonds issued pursuant to the TIF Act may not be used to pay for costs incurred in building such a facility if it is to be owned by or leased to the developer.[63]
 "Question V Can TIF/STAR Bond proceeds be used to finance amusement park rides to be owned by or leased to a developer? This would include only those portions of the rides that are not personal property (e.g. metal tracks, concrete foundations)."
In our opinion, the metal tracks and concrete foundations of amusement park rides would be considered structures.[64] Further, they do not appear to be the type of public infrastructure improvements and amenities authorized as redevelopment project costs in K.S.A. 2005 Supp.12-1770a(q)(1)-(15). Thus, we do not believe that TIF/STAR bond proceeds may be used to construct such facilities.
Sincerely,
PAUL MORRISON
Attorney General
Julene L. Miller
Deputy Attorney General
PM:JLM:jm
[2] K.S.A. 12-1770 et seq.
[3] Commonly referred to as TIF bonds, referring to those to be repaid from the property tax increment, or STAR bonds, referring to those to be repaid from sales taxes generated within the redevelopment district.
[4] Attorney General Opinions No. 2004-6, 2005-14, 2006-14.
[5] As defined by K.S.A. 2005 Supp. 12-1770a(g).
[6] K.S.A. 2005 Supp. 12-1774(a)(1).
[7] K.S.A. 2005 Supp. 12-1774(a)(1). See also K.S.A. 12-1770.
[8] K.S.A. 2005 Supp. 12-1774(b)(1).
[9] A "redevelopment project" is one that is approved in accordance with the TIF Act to implement a "redevelopment project plan," as defined by K.S.A. 2005 Supp. 12-1770a(u), for the development of an established "redevelopment district," as defined by K.S.A. 2005 Supp.12-1770a(r).
[10] K.S.A. 2005 Supp. 12-1774(e).
[11] Emphasis added.
[12] K.S.A. 2005 Supp. 12-1774(a)(1)(D) and (G). See Attorney General Opinion No. 2004-24.
[13] See Correspondence re: OR 19-2006 from Rebecca E. Floyd, Executive Vice President/General Counsel, Kansas Development Finance Authority, August 8, 2006.
[14] See Stalcup v. Detrich, 27 Kan.App.2d 880, 886 (2000). Seealso K.S.A. 2005 Supp. 77-201 Eighth, Ninth and Tenth.
[15] K.S.A. 2005 Supp. 12-1773(b), as amended by L.2006, Ch. 192, § 3 and Ch. 201, § 5.
[16] Correspondence re: Tax Increment Financing Act-Opinion Request from Gary A. Anderson, Gilmore Bell, P.C., July 26, 2006.
[17] O'Donoghue v. Kansas Farm Bureau Mut. Ins. Co., Inc.,275 Kan. 430, 432-33 (2003) (internal citations omitted).
[18] Board of County Com'rs of Leavenworth County v. McGraw FertilizerService, Inc., 261 Kan. 901, 919 (1997), opinion modified on rehearing,261 Kan. 1082.
[19] See K.S.A. 12-1770.
[20] Attorney General Opinions No. 2005-14, 2004-6.
[21] K.S.A. 2005 Supp. 12-1770a(q)(1).
[22] K.S.A. 2005 Supp. 12-1773(b), as amended by L.2006, Ch. 192, § 3 and L.2006, Ch. 201, § 5.
[23] See also, In re Marriage of Kimbrell, 34 Kan.App.2d 413, 422
(2005).
[24] 8th ed. 2004.
[25] 1424. See also The American Heritage Dictionary 1208 (2d Coll. Ed. 1985) (a structure is commonly defined as something that is constructed).
[26] K.S.A. 3-701(6); K.S.A. 2005 Supp. 12-1750(a); K.S.A.68-1101(4).
[27] K.S.A. 2005 Supp. 12-1770a(c)(A), (d).
[28] State v. Moler, 269 Kan. 362, 365-69 (2000); State v.Fisher, 232 Kan. 760, 763-64 (1983).
[29] Fisher, 232 Kan. at 761-62.
[30] L. 1976, Ch. 69, § 4(b). The provision was originally placed in K.S.A. 12-1773, and later moved to a newly created definitions section, K.S.A. 12-1770a, in 1999.
[31] Reports of Special Committees to the 1976 Kansas Legislature, Re: Proposal No. 40 — Urban Redevelopment, page 767.
[32] Id. at 771.
[33] Id. at 771-72.
[34] Id. at 774, 781 lines 26-30.
[35] Id. at 781 line 30 and 782 lines 1-2.
[36] Minutes, House Committee on Federal and State Affairs, January 20, 1976, Attachment.
[37] Minutes, House Committee on Federal and State Affairs, January 28, 1976, Statement by Kansas City, Kansas Mayor John Reardon, Attachment 2.
[38] Minutes, Senate Committee on Local Government, March 23, 1976, Attachment page 2; Journal of the Senate 1463, March 23, 1976.
[39] Journal of the House 2037, March 31, 1976.
[40] L.1979, Ch. 52, § 4(b).
[41] Minutes, House Committee on Local Government, March 21, 1979.
[42] L.1980, Ch. 68, § 3(b).
[43] K.S.A. 12-1794 et seq.
[44] L.1988, Ch. 79, § 1.
[45] L.1988, Ch. 78, § 4(b) and L.1988, Ch. 79, § 1(c).
[46] L. 1988, Ch. 78, § 4(b) (emphasis added to highlight the change).
[47] Minutes, House Committee on Local Government, February 9, 1988, Attachments 1-4, 1-5.
[48] See Id., Attachments 6-3 and 8-3; Minutes, Senate Committee on Local Government, March 23, 1988, Attachments II and XVII;Minutes, Senate Committee on Local Government, March 24, 1988, Attachment II ("[t]he bill specifies the kinds of public improvements that may be made in the district, using tax increment moneys").
[49] Minutes, House Committee on Local Government, February 9, 1988, Testimony of Thomas Powell, Director of Law and City Attorney for the City of Wichita, Attachment 6-3; Minutes, Senate Committee on Local Government, March 23, 1988, Testimony of Thomas Powell, Director of Law and City Attorney for the City of Wichita, Attachment II.
[50] Minutes, House Committee on Local Government, February 9, 1988, Testimony of Dennis Shockley, Director of Intergovernmental and Public Affairs for the City of Kansas City, Attachment 8-3.
[51] L. 1993, Ch. 213, § 2(a)(1)(D).
[52] I.e., redevelopment projects determined by the Secretary of Commerce and Housing to be of statewide as well as local importance, or would create a major tourism area for the state. See L. 1997, Ch. 162, § 2(a)(1)(D).
[53] L. 1997, Ch. 93, § 1.
[54] L. 1998, Ch. 17, § 5(b).
[55] L. 2001, Ch. 103, § 2.
[56] L. 2004, Ch. 183, § 4.
[57] L.2005, Ch. 132, § 1(q).
[58] Legislative Division of Post Audit, Performance Audit Report, Tax Increment Financing in Kansas, Part II: Reviewing a Sample of Districts, page 3, April 1997.
[59] Legislative Division of Post Audit, Performance Audit Report, Wyandotte County: Reviewing the Use of STAR Bond Moneys Associated With the Kansas Speedway and the Village West Tourism District, page 3, February 2005.
[60] Id. at pages 21, 28-30.
[61] See Minutes, House Committee on Local Government, February 9, 1988, Testimony of Brenda M. Manske, Secretary and Legislative Chair for Kansas Downtown Development Association, Attachment 3; Minutes, Senate Committee on Local Government, March 23, 1988, Testimony of Thomas Powell, Director of Law and City Attorney for the City of Wichita, Attachment II ("any increase in assessed valuation of property in the redevelopment district can be used as a pledge to pay for public improvements that are financed with tax increment bonds");Minutes, Senate Committee on Local Government, March 24, 1988, Testimony of Ernie Mosher, representing the League of Kansas Municipalities, Attachment II ("[t]he bill specifies the kinds of public improvements that may be made in the district, using tax increment moneys").
[62] See L. 1997, Ch. 93, § 1; L. 1998, Ch. 17, § 5(b); L. 2004, Ch.183, § 4; L. 2005, Ch. 132, § 1(q).
[63] With the possible exception of certain auto race track facilities.
[64] See Kings Entertainment Co. v. Limbach, 588 N.E.2d 777, 778 (Ohio 1992).